## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MEGAN M. HUNTER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 11-1422** |
| | ) **Chief Judge Gary L. Lancaster** |
| **MICHAEL J. ASTRUE,** | ) |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** | ) |
| | ) |
| **Defendant.** | ) |

### MEMORANDUM OPINION AND ORDER OF COURT

Gary L. Lancaster
Chief Judge                                          September __|𝒪__ , 2012

## I.    Introduction

Plaintiff Megan M. Hunter ("Hunter") brings this action
pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial
review of the final decision of the Commissioner of Social
Security ("Commissioner") denying her applications for
disability insurance benefits ("DIB") and supplemental security
income ("SSI") benefits under Titles II and XVI of the Social
Security Act ("Act") [42 U.S.C. §§ 401-433, 1331-1383f].   The
matter is presently before the Court on cross-motions for
summary judgment filed by the parties pursuant to Federal Rule
of Civil Procedure 56.   (ECF Nos. 12 & 14).   For the reasons
that follow, Hunter's motion for summary judgment (*ECF No. 12*)
will be denied, the Commissioner's motion for summary judgment

(*ECF No. 14*) will be granted, and the Commissioner's final decision will be affirmed.

## II. Procedural History

Hunter protectively applied for DIB and SSI benefits on September 18, 2008, alleging that she had become "disabled" on April 15, 2008. (R. at 164, 173, 185, 194). The Pennsylvania Bureau of Disability Determination denied the applications on January 23, 2009. (R. at 89, 94). Hunter responded on March 12, 2009, by filing a timely request for an administrative hearing. (R. at 99-100). She failed to appear at a hearing scheduled for July 15, 2010. (R. at 49-50). On January 19, 2011, a second hearing was held in Pittsburgh, Pennsylvania, before Administrative Law Judge ("ALJ") Guy Koster. (R. at 24). Hunter, who was represented by counsel, appeared and testified at the hearing. (R. at 27-42). David A. Zak ("Zak"), an impartial vocational expert, also testified at the hearing. (R. at 42-45). In a decision dated January 27, 2011, the ALJ determined that Hunter was not "disabled" within the meaning of the Act. (R. at 7-19).

On February 12, 2011, Hunter sought administrative review of the ALJ's decision by filing a timely request for review with the Appeals Council. (R. at 162-163). The Appeals Council denied the request for review on September 22, 2011, thereby making the ALJ's decision the "final decision" of the

Commissioner in this case. (R. at 1). Hunter commenced this action on November 7, 2011, seeking judicial review of the Commissioner's decision. (ECF Nos. 1 & 4). Hunter and the Commissioner filed motions for summary judgment on April 30, 2012, and May 30, 2012, respectively. (ECF Nos. 12 & 14). These motions are the subject of this memorandum opinion.

## III. Standard of Review

This Court's review is plenary with respect to all questions of law. *Schaudeck v. Commissioner of Social Security Administration*, 181 F.3d 429, 431 (3d Cir. 1999). With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)(internal

3

quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions.

4

He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively-delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process by stating as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he

5

is determined not to be disabled. If the claimant
survives the fourth stage, the fifth, and final, step
requires the SSA to consider so-called "vocational
factors" (the claimant's age, education, and past work
experience), and to determine whether the claimant is
capable of performing other jobs existing in
significant numbers in the national economy. §§
404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157

L.Ed.2d 333 (2003)(footnotes omitted). Factual findings

pertaining to all steps of the sequential evaluation process are

subject to judicial review under the "substantial evidence"

standard. *McCrea v. Commissioner of Social Security*, 370 F.3d

357, 360-361 (3d Cir. 2004).

        In an action in which review of an administrative

determination is sought, the agency's decision cannot be

affirmed on a ground other than that actually relied upon by the

agency in making its decision. In *Securities & Exchange

Commission v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91

L.Ed. 1995 (1947), the Supreme Court explained:

    When the case was first here, we emphasized a simple
    but fundamental rule of administrative law. That rule
    is to the effect that a reviewing court, in dealing
    with a determination or judgment which an
    administrative agency alone is authorized to make,
    must judge the propriety of such action solely by the
    grounds invoked by the agency. If those grounds are
    inadequate or improper, the court is powerless to
    affirm the administrative action by substituting what
    it considers to be a more adequate or proper basis.
    To do so would propel the court into the domain which
    Congress has set aside exclusively for the
    administrative agency.

6

*Chenery Corp.*, 332 U.S. at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision. *Cefalu v. Barnhart*, 387 F.Supp.2d 486, 491 (W.D.Pa. 2005).

## IV. The ALJ's Decision

In his decision, the ALJ determined that Hunter had not engaged in substantial gainful activity subsequent to her alleged onset date. (R. at 13). Hunter was found to be suffering from chronic pain in her lower back, obstructive sleep apnea, headaches, bipolar disorder, an unspecified anxiety disorder, and a history of polysubstance abuse. (R. at 13). These impairments were deemed to be "severe" under the Commissioner's regulations. (R. at 13); 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c). The ALJ concluded that Hunter's impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-15).

In accordance with 20 C.F.R. §§ 404.1545 and 416.945, the ALJ assessed Hunter's "residual functional capacity"[1] as follows:

_____

[1] The term "residual functional capacity" is defined as "that which an individual is still able to do despite the limitations caused by his or her impairments." *Hartranft v. Apfel*, 181 F.3d 358, 359, n. 1 (3d Cir.

7

After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except claimant is limited to performing jobs requiring only simple, routine, repetitive tasks, requiring little independent decision making with little or no changes in the work setting and only occasional contact with the general public, co-workers and supervisors.

(R. at 15). Hunter had "past relevant work"[2] experience as a customer service specialist, sales clerk and waitress. (R. at 43). Zak classified those jobs as "semi-skilled"[3] positions at the "sedentary"[4] and "light"[5] levels of exertion. (R. at 43).

_____

1999)(parentheses omitted), citing 20 C.F.R. § 404.1545(a). The same residual functional capacity assessment is used at the fourth and fifth steps of the sequential evaluation process. 20 C.F.R. §§ 404.1545(a)(5)(i)-(ii), 416.945(a)(5)(i)-(ii).

[2] "Past relevant work" is defined as "substantial gainful activity" performed by a claimant within the last fifteen years that lasted long enough for him or her to learn how to do it. 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). The Commissioner has promulgated comprehensive regulations governing the determination as to whether a claimant's work activity constitutes "substantial gainful activity." 20 C.F.R. §§ 404.1571-404.1576, 416.971-416.976.

[3] "Semi-skilled work is work which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks." 20 C.F.R. §§ 404.1568(b), 416.968(b).

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered

8

Since Hunter was deemed to be capable of performing only "unskilled"[6] work, it was determined that she could not return to her past relevant work. (R. at 18).

Hunter was born on February 5, 1979, making her twenty-nine years old on her alleged onset date and thirty-one years old on the date of the ALJ's decision. (R. at 18, 27). She was classified as a "younger person" under the Commissioner's regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c). She had more than a high school education[7] and an ability to communicate in English. (R. at 18, 28, 197, 204); 20 C.F.R. §§ 404.1564(b)(4)-(5), 416.964(b)(4)-(5). Given the applicable residual functional capacity and vocational assessments, the ALJ concluded that Hunter could work as a housekeeper/cleaner, retail marker or photocopy machine operator. (R. at 18). Zak's testimony established that these jobs existed in the national

---

capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b).

[6] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, [the Commissioner] consider[s] jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs." 20 C.F.R. §§ 404.1568(a), 416.968(a).

[7] Hunter testified that she had completed four years of college. (R. at 28). The record indicates that she finished college in 2003. (R. at 204, 574).

9

economy for purposes of 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).[8]  (R. at 44).

## V. Discussion

Dr. Ravi Kant has been Hunter's treating psychiatrist since March 2007. (R. at 245). Kirstyn Zalice ("Zalice"), a certified registered nurse practitioner ("CRNP") working under Dr. Kant's supervision, has treated Hunter on many occasions. (R. at 32-33). Zalice has overseen Hunter's medication regimen throughout the course of her treatment. (R. at 33).

In July 2004, Hunter started working as a customer service specialist for a financial institution. (R. at 199). She left work early on April 15, 2008, due to symptoms caused by "anxiety." (R. at 198). The anxiety attack apparently caused Hunter to experience "chest heaviness" and shortness of breath. (R. at 279). An ambulance transported her to an emergency room. (R. at 279). Objective testing yielded no medical reasons for Hunter's symptoms. (R. at 279, 571-572, 625). Consequently, it was determined that the symptoms were attributable to her psychiatric impairments. (R. at 279). Hunter never returned to work. (R. at 198).

---

[8] At the fifth step of the sequential evaluation process, "the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, [he or] she can perform work that exists in significant numbers in the regional or national economy." *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003). This burden is commonly satisfied by means of vocational expert testimony. *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005).

Hunter was admitted to St. Clair Hospital's[9] partial hospitalization program on May 27, 2008. (R. at 387). During the course of her partial hospitalization, she was expected to attend treatment sessions for five hours per day. (R. at 388). Hunter was discharged on June 24, 2008. (R. at 299). It was noted that Hunter had failed to meet some of the goals listed in her treatment plan, and that she needed to address her "substance abuse problem." (R. at 382). She had apparently been abusing drugs and alcohol prior to June 21, 2008. (R. at 38-39).

After completing her partial hospitalization, Hunter entered a drug rehabilitation program conducted by the White Deer Run/Cove Forge Behavioral Health System. (R. at 282-283). She was discharged from the program on July 23, 2008. (R. at 283). Dr. Tom Baumgarten reported that Hunter's prognosis was "fair," but that she needed to continue receiving "intensive outpatient treatment." (R. at 282-283).

On July 29, 2008, Hunter reentered the partial hospitalization program at St. Clair Hospital. (R. at 395, 539-540). Her partial hospitalization ended on September 30, 2008. (R. at 507). Although Hunter had not met all of her treatment goals at the time of her discharge, she was encouraged to

---

[9] St. Clair Hospital is located in Pittsburgh, Pennsylvania. (R. at 387).

11

continue working toward those goals in an intensive outpatient treatment program. (R. at 505, 507).

On December 15, 2008, Dr. Lawrence B. Haddad performed a consultative psychological evaluation of Hunter in connection with her applications for DIB and SSI benefits. (R. at 573-579). In a written report detailing the findings of his evaluation, Dr. Haddad described Hunter as "a socially mature individual" who was able to deal with supervisors, co-workers, and members of the general public. (R. at 577). Hunter's ability to interact appropriately with supervisors and co-workers was deemed to be "slightly" limited, while her ability to interact appropriately with members of the general public was deemed to be "moderately" limited. (R. at 578). Dr. Haddad reported that Hunter could "carry out instructions," "perform activities within a schedule," "attend [to] a task from beginning to end," "sustain[] a routine," "make[] simple decisions," and "perform at a consistent pace." (R. at 577). Only "slight" limitations were found in Hunter's ability to understand, remember and carry out detailed instructions. (R. at 577). Dr. Haddad found a "moderate" limitation in Hunter's ability to respond appropriately to work pressures in a usual work setting and a "slight" limitation in her ability to respond appropriately to changes in a routine work setting." (R. at 578).

Dr. Michelle Santilli, a non-examining psychological consultant, opined on December 22, 2008, that the limitations resulting from Hunter's impairments did not preclude her "from meeting the basic mental demands of competitive work on a sustained basis." (R. at 582). Hunter was deemed to be capable of "perform[ing] simple, routine, repetitive work in a stable environment." (R. at 582). Dr. Santilli further stated that Hunter could "understand, retain, and follow simple job instructions," "make simple decisions," and "sustain an ordinary routine without special supervision." (R. at 582). Lorraine Proch ("Proch"), a non-examining medical consultant, indicated on January 14, 2009, that Hunter was physically capable of performing work at any level of exertion, provided that the work did not involve exposure to machinery, heights, or other workplace hazards. (R. at 598-603).

Dr. Karl E. Bushman is Hunter's primary care physician. (R. at 32). On June 3, 2010, Dr. Bushman stated that Hunter's back pain limited her "ability to sit or stand continuously." (R. at 628). He indicated that she could not stand or walk for a full hour, or sit for more than four hours, during the course of an eight-hour workday. (R. at 626). Hunter was deemed to be capable of "frequently" lifting objects weighing between eleven and twenty pounds. (R. at 626). Dr. Bushman opined that Hunter

13

was limited to only "occasional" bending.[10] (R. at 627). He described Hunter's "emotional disability" as her "main problem." (R. at 627). Dr. Bushman predicted that Hunter's impairments would necessitate ten to fifteen absences per month if she were to secure a full-time job. (R. at 627).

In a handwritten statement dated January 18, 2011, Hunter's mother stated that Hunter's "low moods" had sometimes kept her "on the couch." (R. at 241). The statement provided by Hunter's mother was presented to the ALJ at the hearing. (R. at 26-27). Hunter testified that she was not receiving treatment or taking medication for her back pain. (R. at 31, 41). In response to a question posed by the ALJ, Hunter stated that she would experience pain in her "lower to mid-back" whenever she lifted objects weighing more than thirty pounds. (R. at 42). She declined to attribute any additional limitations to her back impairment. (R. at 42).

Zak testified that an individual who needed to miss two or more days of work per month "would not be able to sustain full-time competitive employment." (R. at 45). The ALJ, however, accorded "little weight" to Dr. Bushman's assertion that Hunter's impairments would cause her to miss work on a frequent basis. (R. at 17). In light of Hunter's acknowledgment that

[10] Although the limitation restricting Hunter to only "occasional" bending was not incorporated within the ALJ's residual functional capacity assessment, it was incorporated within his hypothetical question to Zak. (R. at 15, 43).

14

her back impairment had resulted in no physical limitations beyond the thirty-pound lifting restriction described in her testimony, the ALJ concluded that a restriction precluding the performance of work above the "light" level of exertion would adequately account for that impairment. (R. at 15).

Under these circumstances, the ALJ was not required to credit Dr. Bushman's opinion. *Brown v. Astrue,* 649 F.3d 193, 196, n. 2 (3d Cir. 2011). Even though Dr. Bushman was asked to describe only *physical* limitations, he stated that Hunter's "emotional disability" was her "main problem." (R. at 627). In this respect, Dr. Bushman's assessment was "internally contradictory." *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991). After reviewing the documentary record, Proch indicated that Hunter had no exertional limitations. (R. at 599). Furthermore, Hunter testified under oath that she was not being treated for her back impairment, and that she would experience back pain only while lifting objects weighing more than thirty pounds. (R. at 31, 41-42). Consequently, the ALJ's findings concerning Hunter's physical limitations are "supported by substantial evidence." 42 U.S.C. § 405(g).

When asked why she believed that her "psychological problems" had rendered her incapable of working, Hunter testified that she had "a very short temper," that she was "easily irritated," and that she had "trouble staying on task."

15

(R. at 34). Hunter also described difficulties pertaining to
her memory and writing ability. (R. at 34). The ALJ found
Hunter's subjective complaints to be lacking in credibility to
the extent that they had described limitations beyond those
included within his residual functional capacity assessment.
(R. at 17). Since the record contained objective evidence of
mental impairments that could reasonably be expected to cause
the symptoms alleged in Hunter's testimony, her subjective
complaints were entitled to "serious consideration." *Mason v.
Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). Nonetheless, the
ALJ was not required to credit Hunter's testimony in every
respect. *Chandler v. Commissioner of Social Security*, 667 F.3d
356, 363 (3d Cir. 2011).

Hunter maintains that the ALJ wrongfully rejected her
testimony on the basis of statements that were "demonstrably
false." (ECF No. 13 at 11). She assails the ALJ for *falsely*
stating that she had never been seen by Dr. Kant. (*Id.*).
Hunter contends that while Zalice had treated her many times,
she had been directly examined by Dr. Kant on other occasions.
(*Id.*). In the relevant portion of his decision, the ALJ stated
as follows:

> I find it noteworthy to mention that the claimant has
> not participated in any mental health treatment since
> 2008 at which time she was seen for outpatient mental
> health therapy. From that point forward, the
> Certified Registered Nurse Practitioner (CRNP) at Dr.

16

> Kant's practice sees the claimant for her condition
> and the doctor, based on the CRNP findings, prescribes
> her medication. The claimant was never seen by Dr.
> Kant. The medical records covering treatment from
> 2008 through present, demonstrate continued
> improvement with regard to symptomatology in
> conjunction with medication adjustments.

(R. at 16). The context of the ALJ's statement clearly
indicates that he was referring only to the period of time
postdating 2008. (R. at 16). He did not suggest that Dr. Kant
had not examined Hunter on previous occasions. At the hearing,
Hunter *testified* that she had not seen Dr. Kant since December
2008. (R. at 33). Even if the ALJ's observation was factually
incorrect, he cannot be faulted for assuming the truth of facts
provided by Hunter.

The ALJ referred to a "seven-month lapse" in Hunter's
treatment in the portion of his decision discussing treatment
notes provided by Dr. Kant and Zalice. (R. at 16). The period
of time referenced in the ALJ's decision apparently consisted of
the seven months elapsing between treatment sessions conducted
on May 12, 2008, and December 16, 2008. (R. at 631). Hunter
participated in a partial hospitalization program during that
period of time. (R. at 387-389, 539-540). She argues that her
two partial hospitalizations cannot be reasonably characterized
as a "lapse" in her treatment. (ECF No. 13 at 11-12). It is
worth noting that Dr. Kant's treatment note described the

relevant seven-month period as a "hiatus" in Hunter's treatment
sessions. (R. at 631). In any event, the nomenclature used by
the ALJ is not what matters. A mistake having no bearing on the
outcome of a case cannot justify a remand for further
proceedings. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir.
2005). The critical question is whether the ALJ overlooked
important information.

Hunter correctly asserts that the ALJ had an obligation to
explain his reasons for rejecting the evidence that he decided
not to credit. (ECF No. 13 at 11). Such an explanation was
needed in order to facilitate meaningful judicial review of his
factual findings. *Burnett v. Commissioner of Social Security
Administration*, 220 F.3d 112, 121 (3d Cir. 2000). Nevertheless,
the ALJ was not required to make reference to every treatment
note contained in the record. *Fargnoli*, 247 F.3d at 42; *Davis
v. Astrue*, 830 F.Supp.2d 32, 47 (W.D.Pa. 2011). He was only
required to discuss evidence that was both pertinent to Hunter's
case and probative of her ability (or inability) to work.
*Johnson v. Commissioner of Social Security*, 529 F.3d 198, 203-
205 (3d Cir. 2008). It was Hunter's responsibility to
demonstrate that her medically determinable impairments resulted
in specific work-related limitations. *Baker v. Astrue*, 617
F.Supp.2d 498, 510 (E.D.Ky. 2008). Although Hunter accuses the
ALJ of rejecting "evidence" without explaining his reasons for

18

doing so, she does not explain what functional limitations should be gleaned from that "evidence." (ECF No. 13 at 11-14).

Where conflicting medical opinions are offered, an administrative law judge "is free to choose the opinion of one doctor over that of another." *Diaz v. Commissioner of Social Security*, 577 F.3d 500, 505 (3d Cir. 2009). In so doing, however, the administrative law judge must explain his or her reasons for crediting one medical assessment over another. *Reefer v. Barnhart*, 326 F.3d 376, 381-382 (3d Cir. 2003). The ALJ accorded "significant weight" to Dr. Haddad's examination report in determining Hunter's residual functional capacity. (R. at 16). He provided adequate reasons for rejecting Dr. Bushman's opinion. (R. at 16-17).

As a CRNP, Zalice did not qualify as an "acceptable medical source" under the Commissioner's regulations. 20 C.F.R. §§ 404.1513(a), 416.913(a). For this reason, she was not able to confirm the existence of a "medically determinable impairment." *Id.* Nonetheless, Zalice's opinions were relevant for the purpose of determining the degree to which Hunter's established impairments interfered with her ability to work. 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1).

Hunter faults the ALJ for failing to properly consider the "opinion evidence" provided by Zalice. (ECF No. 13 at 13). This argument begs the question. Hunter points to nothing in

19

the record which suggests that Zalice rendered an opinion
describing her work-related abilities and limitations. (*Id.* at
12-14). In this context, the relevant question is whether the
limitations identified by a medical source prevent a claimant
from engaging in substantial gainful activity. *Doak v. Heckler*,
790 F.2d 26, 29-30 (3d Cir. 1986). Impairments which do not
result in functional limitations are irrelevant to the inquiry.
*Pearson v. Barnhart*, 380 F.Supp.2d 496, 505 (D.N.J.
2005)("Residual functional capacity is defined as that which an
individual is still able to do despite the *limitations* caused by
his or her impairments.")(emphasis added).

A vocational expert's testimony cannot be relied upon to
establish the existence of jobs in the national economy
consistent with a claimant's residual functional capacity unless
the question eliciting that testimony properly incorporates all
of the claimant's functional limitations. *Burns v. Barnhart*,
312 F.3d 113, 123 (3d Cir. 2002). Where a credibly established
limitation is omitted from an administrative law judge's
hypothetical question to a vocational expert, there is a danger
that the vocational expert will identify jobs requiring the
performance of tasks that would be precluded by the omitted
limitation. *Ramirez v. Barnhart*, 372 F.3d 546, 552-555 (3d Cir.
2004). Hunter asserts that the ALJ erred in failing to include
certain "moderate" limitations within his hypothetical question

to Zak. (ECF No. 13 at 15-17). That argument is lacking in merit.

At the third step of the sequential evaluation process, the ALJ determined that Hunter had "moderate" difficulties with respect to her maintenance of social functioning and her maintenance of concentration, persistence or pace. (R. at 14). The "moderate" difficulties found by the ALJ pertained to the "B" criteria of Listings 12.04, 12.06 and 12.09. 20 C.F.R. Part 404, Subpart P, Appendix 1, Listings 12.04, 12.06 & 12.09. They did not relate to Hunter's residual functional capacity. 61 FED. REG. 34474, 34477 (1996). A residual functional capacity inquiry "requires a more detailed assessment" than that required under the "B" criteria of the Listings. *Id.* The ALJ accommodated Hunter's "social functioning" difficulties by restricting her to a range of work involving only occasional contact with supervisors, co-workers, and members of the general public. (R. at 15). He accounted for her difficulties in maintaining "concentration, persistence or pace" by limiting her to jobs involving "simple, routine, repetitive tasks," "little independent decision making," and "little or no changes in the work setting." (R. at 15). These limitations were conveyed to Zak at the hearing. (R. at 43-44). Therefore, Zak's testimony established the existence of jobs in the national economy that could be performed by an individual with Hunter's abilities and

21

limitations. *Boone v. Barnhart*, 353 F.3d 203, 205-209 (3d Cir. 2003).

While Hunter was partially hospitalized, her ability to work was clearly compromised by her need to attend treatment sessions. That is a factor that must be taken into account in determining whether she was "disabled" during the relevant period of time. *Kangas*, 823 F.2d at 778 ("Even if Kangas were able to obtain an unskilled, sedentary job, it is not reasonable to expect him to be able to retain any such job when he has an impairment with his lungs that requires frequent hospitalizations."). Nevertheless, a claimant attempting to establish his or her entitlement to benefits under the Act must demonstrate that both his or her medically determinable impairment (or combination of impairments) and his or her inability to work have lasted (or are expected to last) for the statutory twelve-month period. *Barnhart v. Walton*, 535 U.S. 212, 214-222, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002). Hunter's last partial hospitalization ended five-and-a-half months after her alleged onset date. (R. at 507). Consequently, her partial hospitalizations did not last long enough to satisfy the Act's twelve-month durational requirement. *Kangas*, 823 F.2d at 776 (discussing the predicament of a claimant who had been hospitalized eight times over the course of sixteen months).

Dr. Haddad's consultative evaluation was performed eight

months after Hunter's alleged onset date. (R. at 573-579). The ALJ relied on Dr. Haddad's examination report in determining Hunter's residual functional capacity. (R. at 15-16). Even if Hunter was unable to work between April 15, 2008, and December 14, 2008, Dr. Haddad's findings were sufficient to sustain a finding that she could work as of December 15, 2008. (R. at 573-579). Therefore, the arguments advanced by Hunter provide no basis for setting aside the ALJ's decision.

**VI. Conclusion**

For the foregoing reasons, Hunter's motion for summary judgment (*ECF No. 12*) will be denied, and the Commissioner's motion for summary judgment (*ECF No. 14*) will be granted. The Commissioner's decision denying Hunter's applications for DIB and SSI benefits will be affirmed. 42 U.S.C. § 405(g).

AND NOW, this __*10*__ day of September, 2012, IT IS HEREBY ORDERED that the Plaintiff's motion for summary judgment (*ECF No. 12*) is **DENIED**, that the Defendant's motion for summary judgment (*ECF No. 14*) is **GRANTED**, and that the "final decision" of the Commissioner of Social Security is **AFFIRMED**.

BY THE COURT:

Gary L. Lancaster
Chief United States District Judge

cc: All counsel of record